IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAYMAR MCKENZIE, | ) | 2:20-CR-314 |
| | ) | |
| Defendant. | ) | |

## OPINION

**J. Nicholas Ranjan, United States District Judge**

Defendant Raymar McKenzie moves to suppress statements he made during a search of his home on September 18, 2020.  Mr. McKenzie argues that he made the statements in the absence of *Miranda* warnings and due to coercion from the officers executing the search.  After carefully reviewing the relevant facts and legal authorities, the Court finds Mr. McKenzie's arguments unavailing and denies his motion.

## PROCEDURAL BACKGROUND

Mr. McKenzie was indicted on three counts of distributing cocaine; one count of possession of cocaine and fentanyl; one count of possession of a firearm in furtherance of a drug trafficking crime; and one count of possession of a firearm and ammunition by a convicted felon.  ECF 20.  Mr. McKenzie moved to suppress the statements he made during and after the search of his home.  ECF 78.  After the government filed its opposition brief [ECF 81], the Court held a suppression hearing on September 23, 2022 [ECF 83].  The parties elected not to file post-hearing briefing,

given the pre-hearing briefing and the relatively straightforward issues before the Court.  Mr. McKenzie's motion is now ready for disposition.

**FINDINGS OF FACT**

As relevant to the Court's analysis of Mr. McKenzie's motion, the Court makes the following findings of fact.  These findings are based on the testimony and exhibits admitted into evidence at the September 23, 2022, suppression hearing and the warrant report [ECF 79-1]:

1.      Detective Thomas DeFelice, a twenty-eight-year veteran of the Allegheny County Police Department, served as the lead investigator in the investigation of Mr. McKenzie.  ECF 86, 88:13-89:14.

2.      On September 18, 2020, Detective DeFelice led approximately 20 detectives and officers associated with the Allegheny County Police Department and McKeesport Police Department to execute a warrant and conduct a search of Mr. McKenzie, his residence at 811 Park Street in McKeesport, and his vehicle.  *Id.* at 8:12-15, 79:15-16, 98:19-99:5.

3.      Because Mr. McKenzie had a criminal history of firearms violations and fleeing police, the officers decided to wait to serve Mr. McKenzie until they were certain he had entered the residence.  *Id.* at 9:4-21, 99:6-20; ECF 79-1, p. 1.

4.      Mr. McKenzie's vehicle was not at the residence when the officers had finished staging for the search.  ECF 79-1, p. 1.  Mr. McKenzie arrived at and departed the residence twice, forcing the officers to hold their positions.  *Id.*

5.      At approximately 2:57 p.m., Mr. McKenzie again entered the residence, and the officers executed the warrant at 3:05 p.m.  *Id.*

6.      At that time, Detective DeFelice directed a "breach" team to the porch of the residence, and the officers knocked and announced their presence.  ECF 86, 76:12-77:6.   Detective DeFelice waited approximately 18 to 20 seconds, then

- 2 -

instructed the officers to breach after he heard footsteps racing away from the door. *Id.* at 24:17-25:2, 102:16-20.

7.   Upon entry into the house, the breach team, led by Detective Joshua Stegena, encountered Mr. McKenzie on the second floor of the house at the top of the staircase. *Id.* at 10:2-8. The officers instructed Mr. McKenzie to lie on the ground, but he did not comply. *Id.* at 10:9-14. The officers then forced Mr. McKenzie to the ground and cuffed his hands behind his back. *Id.* at 10:14-21. Mr. McKenzie suffered a minor rugburn on his forehead during the takedown. *Id.* at 11:7-14.

8.   After the officers secured the second floor, which took approximately ten seconds, they brought Mr. McKenzie to the kitchen downstairs and sat him in a chair. *Id.* at 29:10-30:6.

9.   The officers securing the basement encountered Mr. McKenzie's dog. *Id.* at 31:7-12, 41:5-11. Detective Michael Feeney asked Mr. McKenzie if he would assist the officers in corralling his dog, and Mr. McKenzie agreed. *Id.* at 41:12-15. Detective Feeney moved Mr. McKenzie's cuffed hands from behind his back to the front of his body so that he could better assist with the dog. *Id.*

10.   Mr. McKenzie and Detective Feeney went into the basement, and Mr. McKenzie secured his dog in a cage. *Id.* at 41:16-17. Detective Feeney then returned Mr. McKenzie to his chair in the kitchen, leaving his hands cuffed at the front of his body. *Id.* at 41:16-19. Detective Feeney testified that moving the cuffs to the front of Mr. McKenzie's body (a more comfortable position) was a routine practice he would have done even if there had been no need to get Mr. McKenzie to assist in securing his dog. *Id.* at 42:10-20.

11.   Detective Keith McGann stood watch over Mr. McKenzie in the kitchen, and Detective DeFelice soon joined him. *Id.* at 110:2-6.

12.   Detective DeFelice introduced himself to Mr. McKenzie and told him that the officers had a warrant to search Mr. McKenzie's house and vehicle. *Id.* at

89:24-90:3; 108:2-4.  Mr. McKenzie asked to see a copy of the warrant, and Detective DeFelice obliged.  *Id.* at 90:4-6.

13.    Detective DeFelice asked Mr. McKenzie if he wished to cooperate with the officers' search, to which Mr. McKenzie replied, "you can't do shit for me, only the DA's office can."  *Id.* at 90:9-11, 91:1-2.

14.    Detective DeFelice explained to Mr. McKenzie that defense attorneys in the past have asked him to speak to prosecutors about leniency for their clients, and that his decision to do so is often based on whether the defendant had cooperated with his investigation.  *Id.* at 91:2-8.  In response, Mr. McKenzie shook his head and stated, "you can't do shit for me."  *Id.* at 91:9-11.

15.    Mr. McKenzie was not *Mirandized* before Detective DeFelice engaged him.  *Id.* at 109:21-23.

16.    During this time, Detective Stegena conducted the search of the house and recovered a safe in a bedroom.  *Id.* at 11:21-12:6.

17.    Detective Stegena proceeded downstairs to the kitchen, where he asked Mr. McKenzie for the passcode to the safe.  *Id.* at 12:8-10.  Mr. McKenzie stated he did not know the passcode.  *Id.* at 12:11-12.  Detective Stegena advised that the officers were going to break open the safe.  *Id.* at 34:21-22.

18.    Mr. McKenzie was not *Mirandized* before Detective Stegena engaged him.  *Id.* at 34:23-35:8; 112:22-113:3.

19.    Detective Stegena proceeded outdoors in order to "ram" and batter open the safe door.  *Id.* at 33:24-34:15.  Detective DeFelice followed him outside, leaving Detective McGann with Mr. McKenzie.  *Id.* at 111:24-112:3.

20.    As the officers worked outside to open the safe, Mr. McKenzie looked to Detective McGann and stated, unprompted, "that shit's fentanyl," in reference to the contents of the safe.  *Id.* at 68:24-69:5; 81:18-21.  Detective McGann then asked how Mr. McKenzie knew the contents of the safe, and Mr. McKenzie responded to the

effect of "because it's mine," or "everything in the house is mine." *Id.* at 14:6-10, 69:5-6, 128:17-23.

21.    Detective McGann left Mr. McKenzie with another officer and went outside to inform Detective DeFelice of Mr. McKenzie's statements. *Id.* at 69:21-24; 85:22-86:3.   He testified it was necessary to warn the other officers because the presence of fentanyl created an immediate danger to them.[1] *Id.* at 69:21-70:1, 82:8-13.

22.    In response to this warning, Detective DeFelice instructed Detective McGann to *Mirandize* Mr. McKenzie, and Detective McGann was handed a card containing written *Miranda* warnings. *Id.* at 70:5-15.

23.    Detective McGann returned to the kitchen and read Mr. McKenzie his rights from the *Miranda* card.   *Id.* at 70:16-18.   Detective McGann asked Mr. McKenzie if he understood his rights and if he was willing to speak with the police, and Mr. McKenzie said "yes." *Id.* at 70:21-24.

24.    Detective DeFelice followed and asked Mr. McKenzie who owned the contents of the safe, to which Mr. McKenzie responded that the contents belonged to him. *Id.* at 91:21-23. Detective DeFelice asked Mr. McKenzie to describe the contents of the safe, and Mr. McKenzie responded, "there's about an ounce and a half of rock and 12 or 13 bricks, and the gun is a black Ruger." *Id.* at 91:23-92:1; ECF 79-1, p. 3.

25.    During the search, Detective Feeney collected the surveillance cameras scattered throughout the house.   ECF 86, 43:1-10.   Detective Feeney asked Mr. McKenzie where the video data was stored, and Mr. McKenzie advised that the data was stored in "the Cloud." *Id.* at 43:18-44:4. Detective Feeney asked if Mr. McKenzie

---

[1] Detective Feeney testified that the act of beating on a safe containing fentanyl could aerosolize it and expose the officers.  ECF 86, 62:14-19.

would provide the username and password to access that data, and Mr. McKenzie shook his head "no." *Id.* at 44:5-9.[2]

26.     According to the warrant report, the officers recovered a Ruger .40 caliber pistol and extended magazine, 12 bricks of suspected heroin/fentanyl, three loose bundles, and two baggies of suspected cocaine from the safe.  ECF 79-1, p. 4.

27.     Overall, the Court finds the testimony of Detectives Stegena, Feeney, McGann, and DeFelice credible, and largely establishing the foregoing facts.

The warrant report describes several other statements Mr. McKenzie made during the rest of the search and after the officers escorted him to a holding area at Allegheny County Police Department headquarters.  ECF 79-1, p. 3.  The parties did not address those statements at the suppression hearing.  In his brief, Mr. McKenzie challenges the statements to the extent that they are part of "one, unbroken [coerced] confession" caused by the officers' failure to *Mirandize* Mr. McKenzie in the first instance.  ECF 79, p. 12.

## DISCUSSION & ANALYSIS

Mr. McKenzie argues that the statements he made both pre- and post-*Miranda* warnings were the result of improper government influences.  Specifically, he argues that: (1) the statements were made in a custodial setting where the police executed a search of Mr. McKenzie's home, while Mr. McKenzie sat handcuffed in a chair; (2) Mr. McKenzie was induced to make the pre-*Miranda* statements following "overtures of leniency" made by the police; (3) officers threatened to involve Allegheny County's Children, Youth, and Families office in the affairs of Mr. McKenzie's girlfriend; and (4) after *Mirandizing* Mr. McKenzie, the officers did not advise him that his pre-

---

[2] None of the Government's witnesses, nor Mr. McKenzie, could recall whether Detective Feeney asked Mr. McKenzie about the camera data before or after he was *Mirandized*, but Detective Feeney testified that the encounter happened "pretty far into the search."  ECF 86, 63:18-64:3.

*Miranda* statements could not be used against him, thus dulling the effect of the *Miranda* warning and creating one unbroken, coerced confession.

The Court is not persuaded by Mr. McKenzie's arguments. While the Court does agree that Mr. McKenzie was subjected to an in-custody interrogation necessitating the reading of his rights, his pre-*Miranda* statements fall within exceptions to *Miranda*. Further, Mr. McKenzie made the statements voluntarily, not due to coercion from law enforcement. The Court does not find Mr. McKenzie's claim of threats involving the Children, Youth, and Families office credible, and the officers need not have informed Mr. McKenzie that his pre-*Miranda* statements could not be used against him. Each of Mr. McKenzie's statements is therefore admissible.

## I.  Mr. McKenzie's pre-*Miranda* statements are admissible.

It is well established that "a defendant who has been taken into custody or otherwise deprived of his freedom of action in any significant way must be given the warnings prescribed in *Miranda v. Arizona*." *United States v. Meran*, No. 16-222, 2017 WL 4803927, at *19 (W.D. Pa. Oct. 23, 2017) (Conti, J.) (cleaned up). *Miranda* warnings are required when a person is both (1) in custody, and (2) subject to interrogation. *U.S. v. Martinez*, 460 Fed. App'x. 190, 193 (3d Cir. 2012).

The failure to administer adequate *Miranda* warnings creates a presumption that "the privilege against compulsory self-incrimination has not been intelligently exercised." *Oregon v. Elstad*, 470 U.S. 298, 310 (1985). Statements elicited from a suspect in custody and under interrogation without adequate warnings are inadmissible at trial, unless an exception applies that would permit their admission. *Id.* at 317.

### A.  Mr. McKenzie was in custody.

"A person is in custody for *Miranda* purposes when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (cleaned up). The question turns on

"whether a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Vidal*, 85 F. App'x 858, 861 (3d Cir. 2004).

Here, Mr. McKenzie was in custody at the time he made his pre-*Miranda* statements.  Upon their entry into the home, officers tackled, frisked, and handcuffed Mr. McKenzie.  ECF 79-1, pp. 1-2.  He was seated and remained handcuffed as approximately 20 officers conducted a search of his house, car, and person.  *Id.* Though Mr. McKenzie was not explicitly told he could not leave, the sheer number of police conducting "a thorough and methodical search of the residence" and his being handcuffed pose objective circumstances that a reasonable person in Mr. McKenzie's position would feel he lacked the freedom of movement to leave.  *Id.* at 2.  Indeed, at the suppression hearing, three of the government's witnesses characterized Mr. McKenzie as "in custody" or "detained" during the search.  ECF 86, 29:15, 56:21, 109:18.

## B.    Mr. McKenzie was interrogated.

For *Miranda* purposes, interrogation refers not only to "express questioning" but "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Here, Detective DeFelice asked Mr. McKenzie if he would cooperate with the officers' search.  ECF 86, 90:9-91:8, 127:6-7.  That was express questioning.  He then advised Mr. McKenzie that he has spoken to prosecuting attorneys in the past to advocate leniency for cooperating defendants.  ECF 79-1, p. 2; ECF 86, 91:2-8.  The purpose of soliciting Mr. McKenzie's cooperation was very likely to recover incriminating evidence against him.  "The statement that the suspect could help herself by cooperating [in an investigation of the suspect] . . . is an indirect way to elicit statements from the suspect." *United States v. Quintana*, No. 12-214S, 2017

WL 8889843, at *13 (W.D.N.Y. Oct. 23, 2017), *report and recommendation adopted*, No. 12-214S, 2018 WL 718565 (W.D.N.Y. Feb. 6, 2018).  The inherent nature of this question and statement pegs this encounter as an interrogation in the sense contemplated by *Innis*.  Thus, the period between Mr. McKenzie being seated in the kitchen to the point when Detective McGann read him his rights falls squarely within the ambit of *Miranda*.

Detective DeFelice needed to read Mr. McKenzie his rights.  He didn't.  The Court must therefore presume in the first instance that any unwarned statements made by Mr. McKenzie were the result of compulsion, unless some exception to *Miranda* applies.  *Elstad*, 470 U.S. at 307.

### C.  Mr. McKenzie's pre-*Miranda* statements fall under exceptions to *Miranda*.

Mr. McKenzie made two incriminating statements before being *Mirandized*. Sometime after Detective DeFelice ceased questioning Mr. McKenzie, Detective Stegena located the safe in a bedroom and brought it downstairs, where he asked Mr. McKenzie for the code to the safe.  ECF 79-1, p. 2; ECF 86, 12:9-10.  After Mr. McKenzie declined to provide the code, Detective Stegena said that he would break open the safe.  ECF 86, 34:21-22.  With Detective DeFelice in tow, he brought the safe outside to force it open.  ECF 79-1, p. 2; ECF 86, 12:7-10, 111:21-112:3.  As Detective Stegena worked on opening the safe outdoors, Mr. McKenzie looked to Detective McGann and stated, unprompted, "that shit's fentanyl."  ECF 79-1, p. 2; ECF 86, 69:4-5.  Detective McGann followed up on this unprompted statement by asking how Mr. McKenzie knew the safe contained fentanyl, to which Mr. McKenzie responded, "because it's mine" or "everything in the house is mine."  ECF 79-1, pp. 2-3; ECF 86, 14:3-5, 69:5-7, 128:22-23.

Mr. McKenzie's first statement ("that shit's fentanyl") falls outside of *Miranda* because it was unprompted.  An unprompted and self-initiated statement, even if

made while in custody, is a spontaneous admission that does not violate *Miranda*.[3] *United States v. Coleman*, No. 10-484, 2011 WL 2619543, at *5 (D.N.J. July 1, 2011), *aff'd*, 545 F. App'x 156 (3d Cir. 2013); *United States v. Davis*, No. 17-271, 2018 WL 4740207, at *10 (W.D. Pa. Oct. 2, 2018) (Fischer, J.).   The testimony at the suppression hearing showed that Mr. McKenzie only made the statement after he understood that Detective Stegena was working, or was about to work, the lock to the safe.  ECF 86, 68:24-69:7, 129:16-18.  This further suggests that Mr. McKenzie made the statement in response to cracking open the safe, not in response to any question posed by any officer, including Mr. McKenzie's prior interactions with Detectives DeFelice and Stegena.   The Court therefore finds that the statement was a spontaneous outburst, not a response to an interrogative question.

And the second statement ("because it's mine" or "everything in the house is mine") falls within the public-safety exception to *Miranda*.  Under the public-safety exception, law enforcement may ask questions that are necessary to protect either the police or the public from imminent danger.  *Davis*, 2018 WL 4740207, at *10 (citing *New York v. Quarles*, 467 U.S. 649, 656-57 (1984)); *United States v. King*, 366 F. Supp. 2d 265, 274 (E.D. Pa. 2005), *aff'd*, 182 F. App'x 88 (3d Cir. 2006).

The revelation that the safe contained fentanyl created an exigency to the safety of the officers who were in the process of "ramming" it open.  *See* ECF 86, 82:10-13 (Detective McGann: "Detective Stegena was smashing the safe and I didn't want any fentanyl exposure to endanger any of the detectives.  So it was my immediate thought to get out there and stop them from doing what they are doing.").  Under the public-safety exception, Detective McGann could fairly ask Mr. McKenzie how he knew the safe contained fentanyl—for example, to gain a better understanding of the

---

[3] Of course, this assumes that the unprompted statement was made voluntarily, and not as the result of coercion.   The Court addresses the voluntariness of Mr. McKenzie's statements below.

potential danger or to test the veracity of Mr. McKenzie's claim.  Based on the sequence of events and the Court's assessment of Detective McGann's credibility, the Court finds that his follow-up question was designed to gain additional critical information of an imminent danger facing a fellow officer.  *United States v. Fautz*, 812 F. Supp. 2d 570, 621 (D.N.J. 2011) (explaining that "'public safety' would include officer safety in an appropriate case"); *see also Quarles*, 467 U.S. at 658-59 ("We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.").

### D.  Mr. McKenzie's statements were made voluntarily.

The Court next conducts a Fourteenth Amendment Due Process analysis, because statements made to a law-enforcement officer are inadmissible if they are made involuntarily.  *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)).

A statement is given voluntarily when it is "the product of an essentially free and unconstrained choice."  *United States v. Ludwikowski*, 944 F.3d 123, 135 (3d Cir. 2019) (quoting *U.S. ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir. 1975)). The inquiry focuses on "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession" and takes into consideration "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."  *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (internal quotation omitted).  These circumstances may include: the element of police coercion; the length and/or continuity of the interrogation; the location of the interrogation; the defendant's maturity, education, physical condition, and mental health; the repeated and prolonged nature of the questioning; the use of physical punishment such as sleep or food deprivation, and; the subject's familiarity with the criminal justice system.  *Halsey v. Pfeiffer*, 750 F.3d 273, 303 (3d Cir. 2014);

*Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002).  It is the government's burden to establish by a preponderance of the evidence that a challenged statement was made voluntarily.  *Jacobs*, 431 F.3d at 108.

Upon a complete review of the record, the Court's assessment of the credibility of the witnesses at the suppression hearing, and considering the totality of the circumstances, the Court finds the government has met its burden and concludes that Mr. McKenzie was not coerced into making any of his pre-*Miranda* statements.  At the time of the search, Mr. McKenzie was a 32-year-old adult who appeared intelligent, calm, and clear-headed throughout the search of his house.  *See* ECF 86, 14:24-15:4, 69:11-17, 71:17-24, 96:25-97:3.   The length of the pre-*Miranda* interrogation itself was brief, as it only consisted of a few short questions.  From the testimony at the suppression hearing and the warrant report, the Court infers those interactions lasted only a few minutes, if that.  Moreover, the entire execution of the search warrant (from when officers arrived on scene, detained Mr. McKenzie, *Mirandized* him, completed the search, arrested him, and transported him to the police station) was 100 minutes[4]; even if one were to consider that entire duration, it wasn't long enough to suggest a degree of coercion.  *See, e.g.*, *Sweet v. Tennis*, 386 F. App'x 342, 347 (3d Cir. 2010) (no coercion where interrogation lasted "only a few hours"); *Butler v. Britton*, No. 08-1594, 2010 WL 3632713, at *21 (W.D. Pa. Aug. 11, 2010) (Lenihan, J.) (no coercion where suspect detained for five hours), *report and recommendation adopted*, No. 08-1594, 2010 WL 3584564 (W.D. Pa. Sept. 10, 2010) (Schwab, J.); *Carter v. Gilmore*, No. 18-249, 2021 WL 1063205, at *9 (D. Del. Mar. 18, 2021) (identifying examples of lengthy in-custody interrogations that were deemed coercive).

---

[4] The warrant report makes clear that the officers initiated the search at 3:05 p.m., and Mr. McKenzie was placed into a holding area at the police station at 4:45 p.m. ECF 79-1, pp. 2-3.

Additionally, Mr. McKenzie was detained in his home, rather than a police station or other law-enforcement environment. The entire record shows Mr. McKenzie was not subjected to repeated and prolonged questioning or was deprived of food, water, or other physical needs. Rather the nature and scope of the questioning was limited to assisting the officers in their lawful search of the house.[5] Mr. McKenzie had demonstrated a familiarity with the legal system, for example by expressing knowledge that "only the DA" could help him, not Detctive DeFelice. ECF 79-1, p. 2; ECF 86, 91:1-11. Mr. McKenzie also had 14 prior felony convictions, had been *Mirandized* before, and was familiar with the *Miranda* process. ECF 20, pp. 6-7; ECF 86, 133:23-134:2.

While Detective DeFelice's questions soliciting cooperation from Mr. McKenzie in exchange for leniency bear on the need for *Miranda* warnings, such statements do not necessarily spoil the voluntariness of the subsequent statements. *Quintana*, 2017 WL 8889843, at *13 ("Agents can discuss the value of cooperating with the authorities with a suspect without vitiating the voluntariness of that suspect's statement."). This is especially true where, as here, the statements suggesting leniency are not misrepresentative, are limited in scope, and do not make guarantees. *See United States v. Falciglia*, 421 F. App'x 146, 147 (3d Cir. 2008). Underscoring the non-coercive nature of Detective DeFelice's question and statement is the fact that Mr. McKenzie refused to cooperate, responding "you can't do shit for me." ECF 86, 91:9-11.

Mr. McKenzie insists that the officers made additional "overtures of leniency" that rendered his statements involuntary. Specifically, he argues that his experience

---

[5] To be sure, there were a number of law-enforcement officers in the house. But those officers were executing the search. There is no evidence that the positioning of the officers created a coercive environment. *See United States v. Price*, 558 F.3d 270, 279 (3d Cir. 2009) (finding consent was voluntary with a large number of officers, but where "circumstances of the encounter were low-key").

being tackled upon the officers' entry, but having had his cuffs moved to the front of his body to assist with his dog, planted a seed in his mind that cooperation with officers would lead to leniency, but resistance would lead to difficulties.  ECF 79, pp. 4-5.  The Court simply doesn't view the interactions here in the same light.  For example, the moving of the handcuffs was done as part of Mr. McKenzie trying to corral the dog; the Court doesn't find it reasonable that someone in Mr. McKenzie's situation, given the sequence of events, would view it any differently.

Mr. McKenzie also claims that the police were more coercive than Detective DeFelice's report and the officers' testimony describe.  He claims (both in his brief and his testimony at the suppression hearing) that officers threatened to call Allegheny County's Children, Youth, and Families office to interfere in his girlfriend's custody over her children if he did not cooperate.  ECF 79, p. 6; ECF 86, 128:17-23.  Mr. McKenzie relies on *Lynumn v. Illinois* to show that these apparent threats rendered all of his statements pre- and post-*Miranda* coerced and inadmissible.  ECF 79, p. 10 (citing 372 U.S. 528, 534 (1963)).  However, the Court finds Mr. McKenzie's testimony at the suppression hearing on this to be lacking in credibility, and doesn't find sufficient support that anyone threatened to call CYF in an attempt to coerce Mr. McKenzie.[6]

But even if the Court accepted Mr. McKenzie's account as true, there are sufficient factual differences between Mr. McKenzie's case and *Lynumn* for the Court to distinguish the instant case.  In *Lynumn*, the Supreme Court concluded that the defendant's confession was coerced because the police threatened the suspect with cutting off her financial aid and taking away custody of her children; she was

---

[6] Similarly, Mr. McKenzie testified that one of the local police officers conducting the search taunted him, challenged him to a fight, and removed his handcuffs to goad him into hitting an officer, while three or four officers watched and the 15 or so other officers conducted the search of the house.  ECF 86, 123-25, 136:19-24.  The Court does not find this testimony to be credible.

encircled by three officers and a twice-convicted felon who had "set her up"; and she had no experience with the criminal law. 372 U.S. at 534. All of these circumstances are absent from Mr. McKenzie's case. *See Janusiak v. Cooper*, 937 F.3d 880, 891 (7th Cir. 2019) (case distinguishable from *Lynumn* because no officer threatened loss of custody unless suspect confessed, suspect was read *Miranda* rights, and suspect had familiarity with criminal justice system with five prior convictions). Further, an officer's threat to a family member is not alone dispositive, but is instead one factor among the totality of circumstances to be considered. *Id.* at 892 (explicit threats to eliminate or interfere with suspect's custody of young children unless suspect confesses are presumed, but not decidedly, coercive).

The Court therefore concludes that though Mr. McKenzie was not *Mirandized*, he made the statements voluntarily. Because valid exceptions to *Miranda* cover both Mr. McKenzie's initial unprompted statement and Detective McGann's inquiry concerning the contents of the safe, the government may use both statements without running afoul of Mr. McKenzie's constitutional rights.

## II.   Mr. McKenzie's post-*Miranda* statements are likewise admissible.

After Mr. McKenzie was eventually *Mirandized*, he made additional incriminating statements, both at his house during the search and later at a police holding area. But because Mr. McKenzie was subjected to custodial interrogation absent *Miranda* warnings, the Court cannot discount the possibility that he made those later statements involuntarily.

Because this situation functionally resembles *Elstad* and *Missouri v. Seibert*, the Court must apply the framework laid out in those cases. First, the Court must determine whether the officers employed a deliberate two-step strategy to avoid *Mirandizing* Mr. McKenzie, or whether the initial failure to *Mirandize* him was inadvertent. *United States v. Naranjo*, 426 F.3d 221, 228, 232 (3d Cir. 2005). If the failure to *Mirandize* was deliberate, then the post-warning statements must be

suppressed unless curative measures are taken to "ensure a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* at 232 (cleaned up). Curative measures may include an advisement by law enforcement that the suspect's prior, unwarned statements may not be used against them. *See id.*

But where the failure to *Mirandize* was inadvertent, the inquiry is governed by *Elstad*, and turns to whether the subsequent statements were made voluntarily. "[T]he finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Id.* (quoting *Elstad*, 470 U.S. at 318).

The record does not show that the officers deliberately failed to *Mirandize* Mr. McKenzie. The warrant report and credible testimony at the suppression hearing describe the officers conducting a thorough, but fast-paced, search through the home. They limited contact with Mr. McKenzie except to improve the efficiency of the search by seeking his cooperation, and then sought limited information to address the exigency created by the revelation that Mr. McKenzie's safe contained fentanyl. Mr. McKenzie's brief likewise suggests the failure to *Mirandize* him was accidental, describing Detective DeFelice's decision to *Mirandize* "as if a lightbulb goes on." ECF 79, p. 6.

Because the Court finds that the detectives did not deliberately fail to *Mirandize* Mr. McKenzie, the Court must determine whether Mr. McKenzie made his post-*Miranda* statements voluntarily. The Court finds that he did.

First, the officers' *Mirandizing* Mr. McKenzie had a curative effect. "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *United States v. Long-Payton*, No. 08-07, 2013 WL 1500682, at *8 (W.D. Pa. Apr. 10, 2013) (Gibson, J.) (quoting

*Elstad*, 470 U.S. at 314).   After receiving *Miranda* warnings, Mr. McKenzie then acknowledged he understood his rights and agreed to speak with the officers.   ECF 86, 70:21-24.   Second, in addition to the voluntariness factors described above, Mr. McKenzie refused to provide certain information to the police after the warnings (*i.e.*, refusing to provide information about his security camera footage) even as he continued to make incriminating statements.   This shows that he did not feel pressured when he did in fact provide incriminating information.   While the officers searched the house, Mr. McKenzie was also seen laughing and asking questions as to how the police were "put onto" him—demeanor suggesting that Mr. McKenzie did not feel coerced.   ECF 79-1, p 3.   Though the officers did not advise Mr. McKenzie that his pre-*Miranda* statements may not be used against him, they were not required to do so.   *Naranjo*, 426 F.3d at 232.

The considerations outlined above, taken from the entire record, establish that Mr. McKenzie's statements both pre- and post-*Miranda* warnings were voluntarily made.   Thus, they will not be suppressed.

## <u>CONCLUSION</u>

For these reasons, the Court will deny Mr. McKenzie's motion to suppress.   An appropriate order follows.


DATE: November 16, 2022                    BY THE COURT:

                                           */s/ J. Nicholas Ranjan*
                                           United States District Judge